ROBERT M. MURPHY, Judge.
|sThis appeal consists of four separate appeals that arise out of the trial court’s April 30, 2014 judgment rendered after a bench trial, as amended by its June 16, 2014 judgment granting the motions for new trial filed by plaintiffs/defendants-in-reconvention, Kenner Plumbing Supply, Inc. (“Kenner Plumbing”) and Maryland Casualty Company (“MCC”).
In the first appeal, defendant/plaintiff-in-reconvention DCL Development, LLC (“DCL”) and intervenor Lafayette Insurance Company (“Lafayette”) appeal the trial court’s April 30, 2014 judgment, as amended by its June 16, 2014 judgment, which awarded damages in favor of plaintiffs/defendants-in-reconvention, Kenner Plumbing, MCC, and Future Property Investments, Inc. (“Future Property”), and against DCL and plaintiff-in-reconvention, Rusich Detailing, Inc. (“Rusich”). The judgment also dismissed with prejudice the reconventional demands filed by DCL and Rusich, and the petition of intervention filed by Lafayette. In their appeal, DCL and Lafayette also challenge an evi-dentiary ruling of the trial court.
In the second and third appeals, Kenner Plumbing and MCC both’appeal the trial court’s June 16, 2014 judgment, which granted their motions for new trial, 14removed Rusich as a party cast in judgment, and apportioned the fault of DCL and Rusich.
In the fourth appeal, DCL and Rusich, as plaintiffs-in-reconvention, appeal the trial court’s April 30, 2014 judgment, which dismissed their reconventional demands with prejudice. In their appeal, DCL and Rusich also challenge two evidentiary rulings made by the trial court.
For the reasons that follow, we affirm the April 30, 2014 judgment, as amended by the June 16, 2014 judgment. We further amend the June 16, 2014 judgment in part, and affirm as amended.
FACTS AND PROCEDURAL HISTORY
This matter arises out of a fire that occurred in Kenner, Louisiana on September 22, 2006, which damaged two eommer- *483 cial buildings separated by an alley. DCL owned one of the buildings involved in the fire (“DCL building”), and Future Property owned the other building involved in the .fire (“Kenner Plumbing building”). The DCL building was divided into two separate units — one unit faced the east end of the block, located at 2519 Florida Avenue, and the other unit faced the west end of the block, located at 2520 Delaware Avenue. At the time of the fire, DCL leased 2519 Florida Avenue to Tonti, in which Tonti stored furniture (“Tonti warehouse”), and it leased 2520 Delaware Avenue to Rusich, in which Rusich operated an automobile repair shop, Rusich Collision Center. DCL[1] and Rusich are both owned and managed by Gary Rusich and Bryon Rusich (“the Rusich brothers”). Rusich and DCL each obtained separate insurance policies from Lafayette, which provided coverage to Rusich and DCL for losses associated with the DCL building.
|fiThe Kenner Plumbing building was located next door to the DCL building, at 2513 Florida Avenue. At the time of the fire, Future Property leased the Kenner Plumbing building to Kenner Plumbing, in which Kenner Plumbing operated a plumbing supply business. Future Property and Kenner Plumbing are both owned and operated by Jody Grass.[2] Kenner Plumbing obtained an insurance policy from MCC, which provided coverage to both Kenner Plumbing and Future Property for losses associated with the Kenner Plumbing building.
On September 20, 2007, Kenner Plumbing, Future Property and MCC (“Plaintiffs”) filed a petition for damages sustained as a result of the fire, against Rusich, DCL, Crown Motors, Inc., Rusich Collision Center, Bryon Rusich, Gary Ru-sich, and Lawrence Rusich. In their petition, Plaintiffs alleged that the fire started in the alley between the Kenner Plumbing building and the DCL building, as a result of Rusich’s employees using heating devices and/or an open flame to repair plastic car bumpers in the alley. Plaintiffs alleged that the alley was under the exclusive control of Rusich.
On November 13, 2007 and November 16, 2007, Rusich and DCL, respectively, filed reconventional demands against Plaintiffs, alleging that the fire started in the Kenner Plumbing building as a result of faulty electrical wiring, Kenner Plumbing and/or Future Property’s failure to maintain their premises, and Kenner Plumbing’s storage of hazardous and explosive materials within the Kenner Plumbing building. Subsequently, Lafayette filed petitions of intervention, seeking to recover the amounts it paid to Rusich and DCL, in the event that Plaintiffs were found to be at fault for the fire.
On November 28, 2012, the trial court signed an order dismissing with prejudice Plaintiffs’ claims against Rusich, Rusich Collision Center, Crown |fiMotors, Inc., Bryon Rusich, Gary Rusich, and Lawrence Rusich, as a result of the parties’ compromise and settlement of those claims. Therefore, DCL was the only remaining defendant as to. the principal demand at the time of trial.
The matter proceeded to a seven-day bench trial on January 15, 16, 17, 21, 22, 23, and 24, 2014. At trial, the parties offered extensive testimony from both lay and expert witnesses regarding how the fire started, who was responsible for the fire, and the resulting damages.
*484 On the day of the fire, Alden Lightfoot was working in a building across the street from the Kenner Plumbing building. On his way back fróm lunch, he saw thick black smoke in the alley rising from behind a fence that connected the Kenner Plumbing building and the Tonti warehouse. The fence was made of corrugated metal, preventing him from seeing through it.' Lightfoot went inside the Kenner Plumbing building to warn them that the building could possibly be on fire. As he entered the Kenner Plumbing building, he did not see any smoke or fire within the building, and he noted that the lights and the computers were still working.
Roy . Logan owned a nearby business located at 2531 Florida Avenue.. On the day of the fire, Logan smelled smoke while inside of his office.- When he went outside to investigate, he saw smoke between the Kenner Plumbing building and the Tonti warehouse. He. went back to his office to call the fire department, and by the.time he returned, he testified that “the wind [was blowing so strong the fire [was] starting to build up all around.” Logan saw flames coming from the alley. He thought the fire was occurring behind the fence, but he could not be certain given the length- of time between the fire and the date of trial.
Kenner Plumbing employees, Ben Whittle,. Richard Keim and James Cámpbell were working in the Kenner Plumbing building on the day of the fire. 17Keim was unaware of any fire at the time he was warned of the fire by a gentleman who worked across the,.street. .Keim noted that the electricity, telephones, and computers were all still working at that time, and he did not see smoke or fire within the building. He walked out of the Kenner Plumbing building and saw smoke and fire in the alley behind the fence, but not on the outside of the Kenner Plumbing building. He then went back into the building to warn everyone of the fire, at which point, he noted that the building’s electricity was still working and that there were no signs of smoke or fire therein.
Whittle first learned of the fire from Keim. At that point, Whittle also noted that the electricity and computers were still working, and that he did not see any smoke or fire within the building. As he exited the building, he saw flames and smoke coming fi-om the alley behind the fence, but not on the outside of the Kenner Plumbing building. When he went back into the Kenner Plumbing building to make sure that everyone got out safely, he noted that the building’s electricity was still working and there were no signs of smoke or fire therein.
Campbell first learned that something was unusual on the day of the fire when he heard a tapping or a pinging sound on his office wall, which faced the alley. After hearing the sound for five to ten minutes, Campbell left his office to investigate the sound. Before he could determine what the sound was, some of Kenner Plumbing’s warehouse employees pointed towards the ceiling where he saw smoke. At that point, Campbell noted that the electricity, telephones, and computers were still working. Campbell also , did not notice any problems with the electrical breaker box, which was located in his office. After exiting the Kenner Plumbing building, Campbell saw smoke and flames in the alley, rising above, the fence. He did not know whether the Kenner Plumbing building was on fire, or if the fire was just burning very close to the building.
|sTom Lowe, a fire investigation supervisor with the Jefferson Parish Fire Department, reported to the scene on the day of the fire. On that same day, Lowe interviewed a Rusich employee named Kenneth Alexander. Lowe testified that Alexander *485 told him that he saw fire coming from an area in the alley where Rusich stored car bumpers. While standing in the alley in front of the burnt remains of bumpers, Alexander told Lowe that he had been in the alley earlier that morning, in that very spot, using a torch to heat plastic bumpers in order to remove dents from the bumpers. Alexander explained to Lowe how he removed dents from bumpers using a torch.
Lowe tried to establish the time of day that Alexander was heating the bumpers in the alley, but Lowe testified that Alexander was evasive and would not commit to a precise time. When Lowe returned a week later to re-interview Alexander, one of the Rusich' brothers handed him a telephone. The person on the telephone identified himself as an attorney, and told Lowe that he could interview Alexander, but that he could not take his statement. Lowe then tried to interview Alexander, but he refused to respond to any of Lowe’s questions.
On October 26, 2006, Alexander gave a statement to a fire investigator retained by Kenner Plumbing, Robert Greene, indicating that he had not been in the alley for the last five months. However, when asked at trial about the last time he was in the alley, Alexander testified that he was in the alley on the day before the fire. When confronted with his prior statement to Greene, Alexander denied the accuracy of that statement. Alexander also denied the accuracy of an affidavit he signed in January of 2012, wherein he also stated that he had not been in the alley for five months before the fire. Alexander testified that due to blurry vision caused by an eye problem, he failed to correct that statement to provide that he had not been in the alley for five days, instead of five months. Alexander also denied ^telling Lowe that he was in the alley on the day of the fire heating bumpers with a torch, and he denied refusing to speak with Lowe when he returned to re-interview him.
Alexander testified that when he was first notified of the fire, he saw smoke and flames coming out of the fuse box on the Kenner Plumbing building, but that he did not see anything on fire in the alley. After exiting the DCL building, Alexander returned to the alley with Gary Rusich to move one of Rusich’s trailers that Rusich kept in the alley. Alexander testified that he still did not see anything on fire in the' alley at that time.
Several other Rusich employees who were present on the- day of the fire also testified at trial. In particular, on the day of the fire, Jeff Bergeron saw smoke coming from the top of the Kenner Plumbing building, and he did not see any smoke or fire in the alley. When Gary Rusich was first notified of the fire, he went into the alley and' saw the top of the Kenner Plumbing building on fire. He did not see anything on fire in the alley. ■ Bryon Ru-sich first learned of the fire when he received a phone call from his brother Gary. When he arrived at the DCL building, Bryon Rusich saw smoke and fire at the top of the Kenner Plumbing building. He looked in the alley through a six-inch gap in the fence that blocked the alley, and saw his brother Gary pushing a tráiler to the back of the alley. Bryon Rusich testified that he did not see anything on fire in the alley at that time. However, Kenner Plumbing offered Bryon Rusich’s prior deposition testimony wherein he stated that he could only see smoke in the alley.
The Rusich brothers built the fence that blocked the alley between the Kenner Plumbing building and the DCL building, and they held the key to the locked gate within the fence. There were two doorways in the DCL building that led into the alley, and no doorways leading from the *486 Kenner Plumbing building 11ninto the alley. Kenner Plumbing employees Whittle, Keim, and Campbell testified that they had never been in the alley during their employment with Kenner Plumbing. Bryon Rusich testified that he never saw any Kenner Plumbing employees in the alley, but that he thought that they could have entered the alley through a small broken fence on the other side of the alley. After acknowledging his prior deposition testimony wherein he stated that no one other than Rusich employees used the alley, Bryon Rusich stated that he was changing his testimony because he now believed that “anything could have happened.”
Rusich stored bumpers in the alley until the bumpers were later retrieved by another company for recycling purposes. In connection with its business, Rusich used heat guns to repair dents in bumpers. Because the bumpers are made of plastic, heating the bumpers allowed Rusich employees to massage the dents out of the plastic bumpers. The heat guns are powered by an electrical cord. Bryon Rusich testified that Rusich employees were not allowed to perform any work in the alley, and that Rusich only used the alley to store bumpers. He also testified that there was no power source in the alley, and that Rusich did not own any hand-held propane torches at the time of the fire, or at the time of trial.
The Rusich brothers managed both DCL and Rusich. Bryon Rusich explained that for the last thirty-three years, he and his brother Gary went to work every day at the DCL building. Bryon Rusich testified that he and Gary Rusich oversaw the day-to-day operations of Rusich, and that they were both fully aware of the work activities of Rusich’s employees.
Plaintiffs called expert witnesses, James Mazerat, Robert Greene, and George Cas-sellas to testify at trial regarding the cause and origin of the fire. Mazerat and Greene testified that on September 25, 2006, they participated in a joint investigation of the fire on behalf of Kenner Plumbing with several other fire | ninvestigators and electrical engineers, including Cassel-las (on behalf of Lafayette), George Hero (on behalf of Tonti), Derek Longeway (on behalf of Kenner Plumbing), Randall Bruff (on behalf of Lafayette), Lowe (on behalf of the Jefferson Parish Fire Department), and Dan Hebert (on behalf of the Department of Alcohol, Tobacco and Firearms).
Mazerat explained that the investigators began by interviewing witnesses and determining the location of the general area where the early stages of the fire occurred. That general area consisted of the south wall of the Tonti warehouse, the alley, and the north wall of the Kenner Plumbing building. Mazerat testified that the investigators examined the Tonti warehouse and did not find any electrical systems or heat-producing devices therein that could have caused the fire. Greene testified that they also did not find any evidence indicating that the fire started within the portion of the DCL building that Rusich operated its automobile repair shop.
As to the Kenner Plumbing building, Mazei-at explained that the investigators conducted a forensic examination of the electrical wiring, components, and distribution panels, in an effort to determine whether an electrical failure within the Kenner Plumbing building caused the fire. Based upon that information, Mazerat and Greene testified that the investigators all agreed that the fire did not originate in the Kenner Plumbing building due to an electrical failure within that building. Mazer-at also ruled out the possibility of a wall cavity fire within the Kenner Plumbing building. Additionally, Cassellas testified that he found no physical evidence of any electrical failures in either the Kenner *487 Plumbing building or in the Tonti warehouse that could have caused the fire.
The investigators also investigated the conditions of the alley. In determining whether there were any potential sources of fuel within the alley, the 112investigators interviewed Kenner Plumbing employees and Rusich employees. Through these interviews, the investigators learned that Rusich stored plastic bumpers in the alley. After ruling out any other possible source of fuel in the alley for the fire, the investigators reviewed information about the bumpers provided in the bumpers’ material safety data sheets. Based upon that information, Mazerat testified that they determined that the ignition temperature of the bumpers was 600 degrees Fahrenheit. The investigators ruled out cigarettes or electrical failures in the alley as a source of ignition of the bumpers. Greene testified that at that point, the only plausible scenario was that some form of human intervention was required to ignite the bumpers.
While attending a training seminar in 2009, Greene first learned of Alexander’s statements to Lowe about his use of a torch in the alley on the day of the fire. Specifically, Greene testified that at the seminar, Lowe told him that Alexander was using a torch in the alley to work on bumpers, that Alexander left the alley for a short time, and then returned and found the alley on fire. Lowe,confirmed telling Greene at the seminar about Alexander’s statement that he was using a torch in the alley on the morning of the fire. However, Lowe denied telling Greene that Alexander indicated that he left the alley and later returned to find it on fire.
Greene testified that a propane torch can reach temperatures in the range of 3,000 degrees Fahrenheit, and that a heat gun can reach temperatures in excess of 1,100 degrees. Lowe did not find remnants of a heat gun or a torch in the alley after the fire. He explained that he would have found remnants of a torch if one were left in the alley, but that he would not have found remnants of a heat gun if one were left in the alley because it would have melted in the fire. Both Greene and Maz-erat testified that both heat devices were capable of producing sufficient |isheat to ignite the bumpers in the alley. Mazerat and Greene concluded that more probably than not, the fire started when a heat device was used in the alley to heat a bumper, which then ignited the bumper to the point of a smoldering stage. When left unattended, they concluded that the flames grew rapidly due to the wind conditions on the day of the fire.
DCL and Rusich called George Hero as an expert witness in the fields of cause and origin of fires and electrical and mechanical engineering. Hero was initially retained by Tonti to investigate the fire, and he participated in the October 2006 joint investigation of the fire in that capacity. Hero testified that at the time of the joint investigation, he believed that the fire started in the alley in the area where the bumpers were located. Once the joint investigation revealed that Hero’s client at the time, Tonti, was not involved in the cause of the fire, he testified that he did not participate any further in the investigation.
Several years later, Hero reviewed eyewitness testimony and other materials related to the fire, which he claimed to have had no knowledge of at the time that he participated in the 2006 joint investigation. Based upon that information, Herd testified that he now believed that the fire started .in the wall cavity of the Kenner Plumbing building, and that the only source of ignition for the fire was electrical. Plaintiffs contested whether the eyewitness testimony and materials Hero re *488 lied upon in forming this opinion were actually unknown to him at the time he initially opined that the fire started in the alley.
Hero testified that the eyewitness testimony regarding the timeline of events was crucial in determining the cause and origin of the fire. Hero also testified that' he believed that the fire started within the wall cavity of the Kenner Plumbing building because one of the building’s PVC vents showed signs that it burned off from the inside of the building’s wall cavity, without significant evidence of | ^charring or scorching on the portion of the PVC vent located on the outside of the building. When asked by the trial judge whether he made a determination that faulty electrical wiring caused the fire, Hero testified that the physical evidence was too badly burned for him to make that determination. He testified that the case hinged on the testimony of who saw what when, rather than the physical analysis.
With respect to damages, Plaintiffs sought recovery for their damages sustained as a result of the fire, including the physical damage to the Kenner Plumbing building, and the lost profits incurred by Kenner Plumbing. As to their claim for physical damages, Plaintiffs presented evidence establishing that they sustained a total of $856,352.60 as a result of the fire. As to their claim for lost profits, Plaintiffs called Burt Verdigets, an expert in- the field of accounting and finance, to testify as to the amount of lost profits sustained by Kenner Plumbing ás a result of the fire. Verdigets calculated the amount of Kenner Plumbing’s lost profits incurred from September 22, 2006 (the date of-the fire) through the end of 2008 (the date' that Kenner Plumbing completed the build-out of its new building), at approximately $2,000,000. Accordingly, Plaintiffs sought to recover damages in the total amount of $2,856,352.60, plus interest from the date of judicial demand.
On April 30, 2014, the trial court issued findings of fact, wherein it found that (1) the1 fire started in the alley as a result of the negligence of a Rusich employee; (2) DCL knew or should have known of the negligent activities taking place on its property; and (3) DCL failed to exercise reasonable care to prevent the damages sustained by Plaintiffs. Accordingly, on that same day, the trial court signed a judgment in favor of Plaintiffs and against DCL and Rusich for the full amount of the damages sought by Plaintiffs — $2,856,-352.60 — together with legal interest from the date of judicial demand, plus costs of the proceedings. The April 1^30, 2014 judgment also dismissed with prejudice the reconventional demands filed by Ru-sich and DCL, and the petition of intervention filed by Lafayette.
On May 12, 2014, Kenner Plumbing and MCC both filed motions for new trial seeking to amend the April 30, 2014 judgment to clarity that only DCL, and not Rusich, should be cast in judgment, given Plaintiffs’ prior settlement and dismissal of their claims against Rusich. Both Kenner Plumbing and MCC attached proposed judgments to their motions, casting DCL in judgment for the full amount of Plaintiffs’ damages awarded by the trial court: $2,856,352.60.
DCL filed an opposition to Kenner Plumbing and MCC’s motions for new trial, wherein it conceded that Rusich should be removed as a party cast in judgment, but argued that the trial court could not cast DCL in judgment for the entire amount of Plaintiffs’ damages as a result of that removal. DCL claimed that Rusich must still remain responsible for its negligence and that of its employees, by way of a comparative fault allocation under La. C.C. art. 2323, so that DCL would only be *489 cast in judgment for damages proportionate to its percentage of fault.
After conducting a hearing on Kenner Plumbing and MCC’s motions for new trial, the' trial court signed a judgment on June 16, 2014, granting the motions and amending the trial court’s- April 30, 2014 judgment in the following respects: (1) removing Rusich as a party cast in judgment, (2) allocating 50% of the fault to DCL and 50% of the fault to Rusich; and (3) awarding damages in favor of Plaintiffs and against DCL for the full , amount of Plaintiffs’ damages: $2,856,352.60, together with legal interest from the date of judicial demand, plus costs of the proceedings.
The appeals of Kenner Plumbing, MCC, Lafayette, DCL, and Rusich now follow.
| ^ASSIGNMENTS OF ERROR
The assignments of error raised in the four appeals within our review, are as follows:

Appeal of DCL and Lafayette

1. The trial court committed legal error by failing to apportion the fault of all persons causing or contributing to the loss; by apportioning equal percentages of fault to DCL and Rusich; and by failing to render a judgment assessing damages against DCL proportionate to its percentage of fault.
2. The trial court erred in finding that the fire started in the alley.
3. The trial court erred in finding that the fire was caused by heating bumpers.
4. The trial court erred in finding that DCL knew or should have known of unspecified “negligent activities” of Kenneth Alexander and other unnamed employees of Rusich, and in finding that DCL failed to exercise reasonable care.
5.The trial court abused its discretion in denying DCL and Lafayette’s motion in limine regarding the testimony of Bert Verdigets because John-stone Supply is not a comparable business to Kenner Plumbing.
Appeals of Kenner Plumbing and MCC[3]
1. The trial court erred in substantively changing its April 30, 2014 Judgment, and the rights of the parties, by apportioning fault, even though no party filed a motion for new trial requesting apportionment of fault.
2. The trial court erred as a matter of law in apportioning fault between DCL and Rusich.

Appeal of DCL and Rusich, as ■ Plaintiffs-m-Reconvention

1. The trial court erred in not concluding that plaintiffs-in-reconvention proved their case by a preponderance of-the evidence.
2. The trial court erred in not concluding that the 'fire started in the Ken-ner Plumbing building.
3. The trial court erred in not permitting J.C. “Jack” Townley to testify as an expert at trial.
4. The trial court erred in failing to admit into evidence the September 22, 2006 “Fire. Incident Reporting System” report.
|17LAW AND ANALYSIS
Within these four appeals, the parties have raised assignments of error regard *490 ing the following issues: (1) DCL, Lafayette and Rusich challenge the trial court’s factual findings as to the cause and origin of the fire, its finding of liability of DCL, and its dismissal of DCL and Rusich’s reconventional demands based upon those factual findings; (2) DCL, Lafayette, Ken-ner Plumbing, and MCC challenge the trial court’s comparative fault allocation, both procedurally and substantively; and (3) DCL, Lafayette, and Rusich challenge three evidentiary rulings of the trial court. We will address the issues raised in the aforementioned assignments of error in that order.
LIABILITY
On appeal, DCL, Lafayette, and Rusich contend that the trial court erred in finding that the fire started in the alley, as a result of a Rusich employee, Alexander, heating bumpers. DCL and Lafayette further contend that the trial court erred in finding DCL liable to Plaintiffs under Article 667.
Appellate courts review factual findings of the trial court under the manifest error standard of review, which applies equally in jury trials and judge trials. Powell v. Reg’l Transit Auth., 96-0715 (La.6/18/97), 695 So.2d 1326, 1328. This standard of review provides as follows:
Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129, 132; Stobarb v. State of Louisiana, through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirety [sic] and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Id. The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Id.; Pinsonneault v. Merchants & Farmers Bank & Trust Co., 01-2217 (La.4/3/02), 816 So.2d 270, 278-79. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Id. However, where documents or objective evidence so contradict the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Rosell, supra at 844-45. But where such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id.
Salvant v. State, 05-2126 (La.7/6/06), 935 So.2d 646, 650.
When findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell, supra at 844. The rule that questions of credibility are for the trier of fact applies equally to the evaluation of expert testimony. Johnson v. Lee, 10-439 (La.App. 5 Cir. 11/23/10), 54 So.3d 704, 706 (citing Lasyone v. Kansas City Southern Railroad, 00-2628 (La.4/3/01), 786 So.2d 682, 693).
*491 In the principal demand, Plaintiffs sought to establish DCL’s liability by showing that the fire started in the alley when a Rusich employee, Alexander, was heating bumpers in the alley. Conversely, in the reconventional' demand, DCL and Rusich sought to establish Plaintiffs’ liability by showing that the fire started in the wall cavity of the Kenner Plumbing building due to faulty electrical wiring. Plaintiffs alleged that La. C.C. art. 667 provided the basis for DCL’s liability, whereas DCL and Rusich alleged that the doctrine of res ipsa loquitur provided the basis for Plaintiffs’ liability.
La. C.C. art. 667 provides as follows: Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage 119to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case. Nonetheless, the proprietor is answerable for damages without regard to his knowledge or his exercise of reasonable care, if the damage is caused by an ultrahazardous activity. An ultra-hazardous activity as used in this Article is strictly limited to pile driving or blasting with explosives.
In Yokum v. 615 Bourbon St, L.L.C., 07-1785 (La.2/26/08), 977 So.2d 859, the Louisiana Supreme Court addressed the issue of whether an owner/lessor of immovable property can be held liable for the actions of its lessee under La. C.C. art. 667. The plaintiffs in Yokum filed suit against the defendant-lessor of a neighboring bar, alleging that the bar created a noise nuisance in violation of Articles 667 and 669. Id. at 861-65. On appeal,* the appellate court affirmed the trial court’s grant of the defendant-lessor’s motion for summary judgment, after finding that liability under Article 667 could not be imposed upon an ownerAessor for the actions of its lessee. Id. at 868.
Before determining the applicability of Article 667 to ownerAessors for the actions of their lessees, the Louisiana Supreme Court began by noting that Article 667 was subjected to the significant tort reform undertaken by the Louisiana Legislature in 1996, when the Legislature changed the theory of liability under which a proprietorAandowner could be held responsible. Id. at 874. Specifically, the Court emphasized that, with the exception of ultrahazardous activities, the 1996 amendments to Article 667 incorporated the requirement that a proprietorAand-owner is responsible for damages to an aggrieved neighbor only upon a showing that (1) he knew or, in the exercise of reasonable care, should have known that his works would cause damage, (2) that the damage could have been prevented by reasonable care, and |⅞0(3) that he failed to exercise such reasonable care. As a result, the Court found that the 1996 amendments to Article 667 “shift[ed] the absolute liability standard to a negligence standard similar to that set forth in La. C.C. art. 2317.1 and the 1996 amendments to Articles 2321 and 2322.” Id.
Because Article 667 dictates that a pro-prietorAandowner can be responsible for the works or activities performed on its property that cause damage to neighbor *492 ing proprietors, the Court concluded that an owner/lessor could also be held liable under Article 667, where such damage was caused by the work or activities of the owner/lessor’s lessee. Id. at 876. The Court reasoned:
Merely because a 'proprietor/landowner utilizes his right as a property owner to lease his property to another does not eradicate his or her responsibilities and obligations, set forth above, as a landowner. Moreover, under the Court of Appeal's rationale, even an owner/lessor with full knowledge of the potentially harmful effects of the lessee tenant’s activities on its property would have little or no responsibility to protect the public and his neighbors from his lessee tenant’s harmful activities. As a result, the Court of Appeal’s interpretation creates a virtual immunity for landowners, allowing them to remove themselves from potential liability for damages that arise out of the ownership of their property by simply establishing a lease on their property. .
Id. at 876. Accordingly, the Court held that an owner/lessor can be responsible for damages caused by the actions of its lessee under Article 667.[4] Id.
In this case, the trial court was presented with substantial lay and expert testimony concerning the cause and origin of the fire and the resulting liability for that fire, over the course of the seven-day trial in this matter. Our review of the record shows that, after considering all of the evidence presented by the parties, the trial court issued well-reasoned and extensively detailed findings of fact. The trial court recounted the testimony of eyewitnesses to the fire, Lightfoot and Logan, noting that they saw smoke rising from the alley between the Kenner Plumbing 121building and the DCL building. Further, the trial court stated that Lightfoot testified that the lights and computers within the Kenner Plumbing building were all functional at the time he entered the building to warn the occupants of the smoke, which was corroborated by the testimony of Kenner Plumbing employees Whittle, Campbell, and Keim.
'The trial court also discussed Lowe’s testimony that on the day of the fire, Alexander told Lowe that he had been in the alley sometime prior to the fire using a heat source to work on bumpers, which Rusich routinely stored in the alley. The trial court acknowledged that Alexander denied giving Lowe that statement, but noted that Alexander gave multiple accounts of when he was last in the alley prior to the fire and that he refused to speak with Lowe when he attempted to conduct a follow-up interview.
In addition, the trial court recounted the testimony regarding the cause and origin of the fire, provided by the expert witnesses called by Plaintiffs — Cassellas, Mazerat, and Greene — and by the expert witness called by DCL and Rusich — Hero. Specifically, the trial court discussed Maz-erat’s conclusion that the fire originated in the alley, due to a Rusich employee heating the bumpers in the alley; Cassellas’ conclusion that there was no physical evidence of an electrical failure that could have caused the fire; Greene’s conclusion that the fire started in the alley and spread quickly, due to the. wind; and Hero’s belief that the fire originated in the wall cavity of the Kenner Plumbing building due to an electrical failure, after initial *493 ly believing that the fire originated in the alley.
Based upon the evidence submitted, the trial court concluded, in pertinent part, as follows:
After carefully considering the evidence submitted by the parties, the Court finds the testimony of Tom Lowe to be credible, and gives great weight to his statements. Additionally, the Court considers the | ^testimony of Kenneth Alexander to be self-serving, suspect and unsupported by the evidence presented. The Court is likewise greatly concerned with his refusal to speak with Mr. Lowe. Thus, his testimony is discounted entirely as unworthy of belief. Additionally, the Court finds the testimony of George Hero to be greatly outweighed by the other expert testimony submitted in this matter, and thus concludes that the fire originated in the alley as a result of the actions of a Rusich employee.
Byron [sic] Rusich testified at trial, and admitted that he and his brother, Gary, maintained responsibilities for Rusich and DCL. Byron [sic] indicated that both he and Gary supervised the day to day activities of the Rusich employees. Based on the foregoing, the Court finds that Kenner Plumbing Supply Inc. has proven by a preponderance of the evidence that the fire was caused solely by the negligence of Rusich’s employees. The Court further finds that DCL knew or should have known of the negligent activities taking place on its property and that DCL failed to exercise reasonable care to prevent the damages sustained by Kenner Plumbing, Future Property, and Maryland Casualty Company.
On appeal, DCL, Lafayette, and Rusich contend that the trial court erred in finding that the fire started in the alley as a result of a Rusich employee, Alexander, heating bumpers. After reviewing the record in its entirety, we find that DCL, Lafayette, and Rusich have failed to show manifest error in the trial court’s findings as to the cause and origin of the fire. We find that DCL, Lafayette, and Rusich’s arguments on appeal essentially ask this Court to re-weigh the evidence presented at trial in their favor. As set forth above, under the manifest error standard of review, the role of an appellate court does not include re-weighing the evidence. At best, DCL, Lafayette, and Rusich’s challenges to the trial court’s findings amount to additional permissible views of the evidence, as opposed to a showing of manifest error. We emphasize that where there are two .permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. See Salvant, supra at 650.
Our review of'the record shows that there was ample evidence presented supporting the trial court’s fact-intensive determinations concerning the cause and l2sOrigin of the fire, which primarily involved factual findings based on credibility determinations. When, as in this case, the trial court’s findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands deference to the trier of fact’s findings, for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell, supra at 844. Given the great deference owed to the trial court’s findings, and based upon our review of the record herein, we find that DCL, Lafayette and Rusich have failed to show manifest error in the trial court’s conclusion that the fire started in the alley as a result of the negligence of a Rusich employee, Alexander.- Consequently, we find *494 no error in the trial court’s conclusion that DCL and Rusich failed to establish that the fire started within the Kenner Plumbing building, as alleged in their reconven-tional demands.
DCL and Lafayette further contend that the trial court erred in finding DCL liable to Plaintiffs under Article 667. We find no error in the trial court’s finding of liability on behalf of DCL under Article 667. In Yokum, the Court held that an owner/lessor can be responsible for damages caused by the actions of its lessee under Article 667 upon a showing that (1) he knew or, in the exercise of reasonable care, should have known that his works would cause damage, (2) that the damage could have been prevented by reasonable care, and (3) that he failed to exercise such reasonable care. Yo-kum, supra at 874. In reaching its conclusion regarding ownerfiessor liability for the actions of its lessee, the Louisiana Supreme Court in Yokum warned against allowing owner/lessors with knowledge of the potential harmful effects of their lessees’ activities to escape responsibility under Article 667 for those activities, by simply establishing a lease on their property. Id. at 875.
|24In this case, the trial court noted that Bryon Rusich admitted that he and his brother Gary maintained managerial responsibilities for Rusich and DCL, and that both he and his brother supervised the day to day activities of Rusich’s employees. Bryon Rusich also testified that he and Gary Rusich went to work every day at the DCL building for the last thirty-three years, and that they were both fully aware of all of Rusich’s employees’ work activities, which included heating bumpers to remove dents. Based upon our review of this evidence, and upon the Court’s decision in Yokum, we cannot say that the trial court was without a reasonable factual basis in finding that DCL knew or should have known of Rusich’s employee’s negligent activity taking place on its property, and that DCL failed to exercise reasonable care to prevent the resulting damages to Plaintiffs caused by those activities. Accordingly, we find no manifest error in the trial court’s determination of liability of DCL under Article 667, or in its dismissal of DCL and Ru-sich’s reconventional demands.
COMPARATIVE FAULT
On appeal, Kenner Plumbing, MCC, DCL and Lafayette all raise assignments of error regarding the issue of comparative fault, including the trial court’s allocation of fault provided in the June 16, 2014 judgment. We begin by addressing the assignments of error raised by Kenner Plumbing and MCC, wherein they contend that (1) the trial court lacked the authority to allocate the fault of DCL and Rusich when it granted their motions for new trial; and (2) the trial court erred as a matter of law in allocating the fault of DCL and Rusich because the comparative fault principles of La. C.C. art. 2323 are not applicable to claims under La. C.C. art. 667. We will then address DCL and Lafayette’s assignments of error, wherein they contend that the trial court erred as a matter of law in several respects, including: (1) allocating equal percentages of fault to DCL and Rusich; 12fi(2) failing to allocate the fault of Bryon Rusich, Gary Rusich, Alexander, and any other negligent Rusich employee; and (3) failing to assess damages against DCL proportionate to its percentage of fault.

The Authority of the Tñal Court to Allocate Fault in the June 16, 201U Judgment

All parties to this appeal agree that the trial court erred in assessing Plaintiffs’ *495 damage award of $2,856,352.60 against Ru-sich in the April 30, 2014 judgment, given the dismissal of Plaintiffs’ claims against Rusich after the parties’ settled those claims. In an attempt to correct this error, Kenner Plumbing and MCC both filed motions for new trial regarding the April 30, 2014 judgment.
Kenner Plumbing filed a “Motion for New Trial to Clarify Judgment,” wherein it requested an amended judgment, “clarifying that [DCL], and not [Rusich], is cast in judgment,” based upon the prior dismissal of Plaintiffs’ claims against Rusich. Similarly, MCC’s motion for new trial regarding the April 30, 2014 judgment requested a corrected judgment casting only DCL in judgment for Plaintiffs’ damages. In its motion, MCC acknowledged that “the Court was absolutely correct in concluding that [Rusich] and [DCL] were both responsible for the damages sustained by [Plaintiffs],” but alleged that Rusich should not have been cast in judgment, due to the parties’ settlement of Plaintiffs’ claims against Rusich. . Both Kenner Plumbing and MCC attached proposed judgments to their motions, casting DCL in judgment for the full amount of Plaintiffs’ damages awarded by the trial court: $2,856,352.60.
DCL filed an opposition to the motions for new trial, wherein it conceded that Rusich .should be removed as a party cast in judgment, but argued that DCL could not be cast in judgment for the entire amount of Plaintiffs’ damages as a result of that removal. Rather, DCL claimed that Rusich must still remain [ ¡^responsible for its negligence and that of its employees, by way of an allocation of fault of all persons causing Plaintiffs’ loss under the comparative fault principles of La. C.C. art. 2323. DCL contended that a comparative fault allocation would ensure that the trial court’s amended judgment would only cast DCL in judgment for damages proportionate to its percentage of fault, after removing Rusich from the judgment.
After conducting a hearing on the motions for new trial, the trial court signed a judgment on June 16, 2014, which granted Kenner Plumbing and MCC’s motions,' removed Rusich as a party cast in judgment, and allocated 50% of the fault to DCL and 50% of the fault to Rusich. However, the trial court did not assess damages against DCL in proportion to its allocation of 50% of the fault to DCL, and instead, assessed damages against DCL for the full amount of Plaintiffs’ previously awarded damages: $2,856,352.60.
On appeal, Kenner Plumbing and MCC emphasize that their motions for new trial only sought to remove one of the two parties initially cast in judgment for Plaintiffs’ damages — Rusich—and to leave the remaining party cast in judgment — DCL— responsible for the full amount, of those damages. Kenner Plumbing and MCC contend that in granting their motions for new trial, the trial court only had the authority to grant their specific request to remove Rusich as. a party cast in judgment, and that it had no authority to conduct a comparative fault allocation of DCL and Rusich after granting that request. They allege that had DCL filed its own timely motion for new trial requesting a comparative fault allocation, instead of alleging it in its opposition to their motions, the trial court would have had the authority to consider the issue of comparative fault in the June 16, 2014 judgment. Because DCL failed to file any such motion for new trial, Kenner Plumbing and MCC allege that the trial court’s fault allocation constitutes an improper | ¡^substantive amendment to a judgment, thereby rendering the June 16, 2014 judgment absolutely null.
■ In support of their arguments, Kenner Plumbing and MCC cite the Louisiana Su *496 preme Court’s decision in Bourgeois v. Kost, 02-2785 (La.5/20/03), 846 So.2d 692, and this Court’s decision in Madere v. St. John the Baptist Parish, 04-1036 (La.App. 5 Cir. 3/1/05), 900 So.2d 73. In Bourgeois, the trial court erroneously signed the defendants’ proposed judgment dismissing the plaintiffs’ claims, when it intended to sign a judgment in favor of the plaintiffs. Bourgeois, supra at 693. After the expira'tion of the delays for filing a motion for new trial, the trial court, on its own motion, signed a second judgment ruling in favor of the plaintiffs. Id.
In reversing the trial court’s second judgment, the Louisiana Supreme Court held that La. C.C.P. art.1951 limits the amendment of judgments to the correction of errors in calculation and - alteration of phraseology, and does not authorize a trial court’to make substantive amendments to final judgments on its Own. Id. at 696. The proper recourse to correct an error of substance within a judgment only follows a timely motion for new trial or a timely appeal. Id. at 695. Because the trial court’s second - judgment substantively amended a final judgment without a timely motion for new trial ever, having been filed, the Court found that the trial court was without authority to amend the original judgment, thus rendering the second judgment an absolute nullity. Id. at 696. Similarly, in Madere, this Court held that where the trial court granted an untimely motion for new trial' and substantively amended a final judgment, the second judgment was an absolute nullity. Mad-ere, supra at 77.
Contrary to Kenner Plumbing and MCC’s assertions, we find the facts Of Bourgeois and Madere to be distinguishable from the instant case. Specifically, both Bourgeois and Madere involve substantive amendments to final judgments | asmade by the trial courtj where no timely motion for new trial was filed. Conversely, in this case we have a substantive amendment to a final judgment made by the trial court, where timely motions for new trial were filed by Kenner Plumbing and MCC, respectively. ■
Our review of those motions for new trial reveals that the basis for both motions for new trial was the. correction of the trial court’s erroneous assessment of damages against Rusich in the April 30, 2014 judgment. Specifically, in their motions, Kenner Plumbing and MCC alleged that because Plaintiffs dismissed their •claims against Rusich after reaching a settlement, Rusich should not have been cast in judgment for any of Plaintiffs’ damages. As such, they sought an.amended judgment “clarifying that [DCL], and not [Ru-sich] is cast in judgment.” Our review of the record shows that the trial court agreed and granted their motions for new trial on that basis.
Simply because Kenner Plumbing and MCC did not desire, or specifically request, that the trial court apportion the fault of Rusich and DCL in connection with granting their timely motions to clarify that only DCL is cast in judgment, does not relegate the June 16, 2014 judgment to an improper substantive amendment by a trial court, as in Bourgeois and Madere. Nor does it amount to an improper grant of post-trial substantive relief to DCL, as Kenner Plumbing and MCC contend.
Notably, in its motion- for new trial to amend the judgment and cast only DCL in judgment, MCC asserted that “the Court was absolutely correct in concluding that [Rusich] and [DCL] were both responsible for the damages sustained by [Plaintiffs] ...” Yet on appeal, MCC claims that in granting its request to amend the judgment, the trial court was without authority to apportion |29that same correctly-determined responsibility of Rusich and DCL *497 for those damages. We find no merit to this argument.
Kenner Plumbing and MCC’s arguments on appeal oversimplify the nature of the trial court’s error that their motions for new trial sought to amend. Specifically, the trial court found both DCL and Rusich at fault in connection with , the fire, .and awarded Plaintiffs all of their damages sustained in the fire, which Kenner Plumbing readily acknowledges in its appellate, brief. However, in awarding those damages, the trial court mistakenly assessed the damages against DCL and Rusich. Therefore, we find that the trial court could not correct its erroneous assessment of damages against Rusich by simply deleting the reference to Rusich from the damage award, and leaving DCL responsible for the full amount of Plaintiffs’ damages, which included the portion of damages previously assessed against Rusich. Based upon the trial court’s findings of fault for the fire and its award to Plaintiffs for all of their damages sustained in the fire, we find that the proportionate fault of Rusich and DCL had to be determined by the trial court, in order for the trial court to properly amend the April 30, 2014 judgment to cast only DCL in judgment for damages.
While we agree that the trial court’s comparative fault allocation within the June 16, 2014 judgment is a substantive amendment to the April 30, 2014 judgment, we do not find, as Kenner Plumbing and MCC suggest, that it was one made by a trial court without authority, as in Bourgeois and Madere. The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. Martin v. Heritage Manor South, 00-1023 (La.4/3/01), 784 So.2d 627, 632. We find that the trial court acted within its authority and discretion when it granted Kenner Plumbing and 'MCC’s timely motions for new trial to clarify that only DCL should be cast in judgment, based upon the settlement |3nand dismissal of Plaintiffs’ claims against Rusich prior to trial. Furthermore, we find that that authority and discretion to clarify the judgment as requested by Kenner Plumbing and MCC’s motions for new trial, included the trial ■ court’s comparative fault allocation of Rusich and DCL, once it removed or relieved Rusich from the damages previously assessed against it.
In any event, we note that even if Ken-ner Plumbing’s and MCC’s motions for new trial had not provided the trial court with the authority to substantively amend the April 30, 2014 judgment by allocating fault in the June 16, 2014 judgment, this Court would still be called upon in this appeal to address the issue of whether the trial court erred in failing to allocate the fault of Rusich and DCL in the April 30, 2014 judgment. This is so because DCL has raised the issue of comparative fault in its timely appeal of that judgment to this Court. See Bourgeois, supra at 695 (finding that the proper recourse to correct an error of substance within a judgment is a timely motion for new trial or a timely appeal).
Kenner Plumbing and MCC also contend on appeal that the trial court was without authority to consider the comparative fault issue because DCL waived the issue by failing to sufficiently raise it prior to the April 30, 2014 judgment. Because our review of the record shows that DCL raised the issue of comparative fault in both its pre-trial memorandum and its post-trial memorandum, we find this argument to be without merit.

The Applicability of Comparative Fault to Claims for Damages Under Article 667

In their appeals, Kenner Plumbing and MCC further contend that the trial court erred as a matter of law in allocating fault *498 because the comparative fault principles of La. C.C. art. 2823 are not applicable to claims under La. C.C. art. 667. Kenner Plumbing and MCC allege that because Article 667 is located within Lithe property-section of the Louisiana Civil Code, and not in the tort section of the Civil Code as is Article 2823, there is no basis to apply comparative fault to nontort claims, such as claims under Article 667. They also contend that because DCL and Rusich are solidary obligors under Article 667, comparative fault cannot be applied because comparative fault does not apply where liability is solidary.
Article 2323 provides, in pertinent part, as follows:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person’s insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person’s identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.
La. C.C. art. 2323(A) & (B).
In Yokum v. 615 Bourbon St., L.L.C., supra at 874, the Louisiana Supreme Court discussed the effects of the 1996 amendments to Article 667. As we have set forth herein, the Court in Yokum found that the amendments to Article 667 had the effect of “shifting the absolute liability standard to a negligence standard similar to that set forth in La. C.C. art. 2317.1 ...” Id. Additionally, the Court emphasized that even before the 1996 amendments to Article 667, it previously interpreted Article 667 as giving rise to delictual Lability, without a finding of negligence, as a species of fault under La. C.C. art. 2315:
In fact, prior to the 1996 amendments, this Court noted the lack of guidance Louisiana Civil Code articles 667, 668, and 669 presented in terms of liability: “[ajrticles 667-669, while setting standards of | ^responsibility for a landowner to his neighbors, do not purport to impose delictual liability for violation of the standards and do not specify whether responsibility is founded on negligence, intentional misconduct, or abuse of right. However, judicial decisions have clarified that conduct by a proprietor viola-tive of Articles 667-669 may give rise to delictual liability, without negligence, as a species of fault within the meaning of La. Civ. Code art. 2315.” Inabnet v. Exxon Corp., 93-0681 (La.9/6/94), 642 So.2d 1243,1251.
Id. at 874, n. 32 (emphasis added).
Prior to the 1996 amendments, the Louisiana Supreme Court in Dean v. Hercules, Inc., 328 So.2d 69 (La.1976), addressed the issue of the applicable prescriptive period to an action for damages under Article 667. In determining that such actions prescribed in one year, the Court held that “an action for damages in violation of article 667 is most closely associated with an action for damages based on *499 [La. C.C. art. 2315],” and that “a violation of article 667 constitutes fault within the meaning of article 2315.” Id. at 72.' See also Butler v. Baber, 529 So.2d 374, 381 (La.1988) (“a violation of La. C.C. art. 667 constitutes fault”); Cooper v. La. Dep’t of Pub. Works, 03-1074 (La.App. 3 Cir. 3/3/04), 870 So.2d 315, 322 (“a violation of Article 667 constitutes fault within the meaning of Article 2315”); White v. Louviere, 95-610 (La.App. 3 Cir. 11/2/95), 664 So.2d 603, 607 (“La. C.C. art. 667 can be treated as a standard of care for the determination of fault under La. C.C. art. 2315.”). Accordingly, the Court in Dean concluded that “[sjince [La. C.C. art. 2315] is broad enough to include the obligations imposed by [Article] 667, and because the acts which would violate the obligations imposed by [Article] 667 could so easily be said to be an ‘act whatever of man that causes damage to another,’ it is entirely logical that the same prescriptive period should apply to both.” Id. at 73 (citations omitted). By that same rationale, we find that it is also entirely logical that comparative fault applies to claims under Article 667, laagiven that Article 2315 “is broad enough to include the obligations imposed by [Article] 667.” Id.
Additionally, in Pelt v. De Ridder, 553 So.2d 1097 (La.App. 3 Cir.1989), the Third Circuit considered the issue of whether comparative fault applies to a finding of liability under Article 667. The court held that comparative fault was applicable to Article 667, and affirmed the trial court’s fault allocation of 65% to the plaintiff and 35% to the defendant. Id. at 1099-1100. Similarly, in Stanford v. Town of Bell, 05-38 (La.App. 3 Cir. 6/1/05), 903 So.2d 1235, 1239, the court reiterated that under Article 667, “[a] plaintiffs recovery will be reduced by his own comparative fault.”
Based upon the foregoing, we reject Kenner Plumbing and MCC’s argument that comparative fault is not applicable to a finding of liability under Article 667. We find the cases relied upon by Kenner Plumbing and MCC in support of their argument to be distinguishable from the instant case because they address the applicability of comparative fault to redhibition, claims, which are actions based in contracts.[5] . It cannot be said, nor does any party to this appeal contend, that a claim for damages under Article 667 is based in contract, as is a redhibition claim. Rather, our review of the foregoing jurisprudence shows that Louisiana courts have- repeatedly held that a violation of Article 667 constitutes fault within the meaning of Article 2315, without á finding of negligence. Therefore, we do not find Kenner Plumbing and MCC’s discussion of cases concerning the applicability of comparative fault to contractual claims, such as redhibition claims, to be instructive or persuasive with respect to the issue of whether comparative fault applies to Article 667 claims. More importantly, our review shows that courts |34have held that comparative fault applies to a finding of liability under Article 667. See Pelt, supra; Stanford; supra. We agree, and find that comparative fault applies to Plaintiffs’ claim against DCL under Article 667.
We further find that comparative fault applies in this case, given the solidary liability of DCL and Rusich under Article 667. Our review shows that Kenner Plumbing and MCC have correctly asserted that DCL and Rusich are solidary obli-gors based upon DCL’s legal liability under Article 667. Specifically, in Chaney v. *500 Travelers Ins. Co., 259 La. 1, 16, 249 So.2d 181 (La.1971), the Court held that under Article 667, a property owner is also responsible for the actions of his agents, contractors and representatives, who become solidarily liable with the owner.
However, we do not agree with Kenner Plumbing and MCC’s assertion that the solidary liability of DCL and Ru-sich somehow precludes the application of comparative fault in this case. In arguing that comparative fault does not apply within the context of solidary obligbrs, Kenner Plumbing and MCC have failed to account for the fact that they settled their claims against one of the solidary obli-gors — Rusich—prior to trial. La. C.C. art. 1808 provides that “a transaction or compromise between the obligee and. one obligor, benefits the other solidary' obli-gors in the amount of the portion of that, obligor.” Accordingly, Louisiana courts have long recognized that a plaintiffs settlement with one solidary obligor reduces his recovery against the remaining soli-dary obligors by the percentage of the proportionate fault of the released obligor. See Taylor v. United States Fid. & Guar. Ins. Co., 680 So.2d 237, 239 (La.1993).
We find that because Plaintiffs settled their claims against one of the sol-idary obligors, Rusich, Louisiana law provides that their recovery against the remaining solidary obligor, DCL, must be reduced in proportion to Rusich’s'percent-age of fault, given that the trial court awarded Plaintiffs the full. amount. of |sstheir damages sought for the physical damage to the Kenner Plumbing building ($856,352.60) and for the lost profits incurred by Kenner Plumbing ($2,000,000). See Taylor, supra; La. C.C. art. 1803; See Pelt, supra. Furthermore, we emphasize that Louisiana law does not allow for double recovery of the same element of damages. Albert v. Farm Bureau Ins. Co., 05-2496 (La.10/17/06), 940 So.2d 620, 622. Therefore, we find no error in the trial court’s application of comparative fault to Plaintiffs’ claim against DCL under Article 667..

■The Trial Court’s Allocation of Fault of DCL and Rusich in the June 16, \ 2011 Judgment

In their appeal, DCL and Lafayette contend that the trial court erred as a matter of law in several respects, including: (1) allocating equal percentages of fault to DCL and Rusich; (2) failing to allocate the fault of Bryon Rusich, Gary Rusich, Alexander, and any other negligent Rusich employee; and (3) failing to assess damages against DCL proportionate to its percentage nf fault. "
As to the trial court’s specific fault allocation, DCL and Lafayette contend that the trial court legally erred in allocating equal percentages- of fault to DCL ' and Rusich, and in failing to allocate the fault of Bryon Rusich, Gary Rusich, Alexander, and of other. negligent Rusich employees. For the reasons that, follow, we find no legal error with respect to the trial court’s fault allocation, as alleged by DCL and Lafayette. Nor do we find, as DCL and Lafayette have further alleged, that any such legal errors would entitle them to a de novo review of the trial court’s findings as to the cause and origin of the fire,[6] The *501 applicable standard of review for the foregoing assignments of error is manifest error.
l3fiLike all factual findings, the trier of fact is owed great deference in its allocation of fault and its findings may not be reversed unless clearly wrong or manifestly erroneous. Ruttley v. Lee, 99-1130 (La. App. 5 Cir. 5/17/00), 761 So.2d 777, 787, writ denied, 00-1781 (La.9/22/00), 768 So.2d 1287 (citing Clement v. Frey, 95-1119, 95-1168 (La.1/16/96), 666 So.2d 607, 609-10). Like the assessment of damages, fault allocation is a factual determination and the trier of fact, unlike the appellate court, has the benefit of viewing firsthand the witnesses and evidence. Id. It is the appellate court’s duty to give deference to the trier of fact. Id.
The allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and any allocation by the factfinder within that range cannot be clearly wrong. Wiltz v. Bros. Petroleum, L.L.C., 13T332 (La.App. 5 Cir. 4/23/14), 140 So.3d 758, 781 (citing Foley v. Entergy La., Inc., 06-0983 (La.11/29/06), 946 So.2d 144, 166). Only after making a determination that the trier of fact’s apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the highest or lowest point respectively which is reasonably within the trial court’s discretion. Duncan v. Kansas City S. Ry. Co., 00-0066 (La.10/30/00), 773 So.2d 670, 680-81.
An appellate court’s determination of whether the trier of fact was clearly wrong in its allocation of fault is guided by the factors set forth in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985), including: 1) whether the conduct was inadvertent or involved an awareness of the danger, 2) how great a risk was created by the conduct, 3) the significance of what was sought by the conduct, 4) the capacities of the actors, and 5) any extenuating factors which might require the actor to proceed with haste, without proper thought. Duncan, supra; Davis v. Vosbein, 12-626 (La.App. 5 Cir. 5/16/13), 119 So.3d 100, 102.
|S7In this case, DCL and Lafayette contend that the trial court’s allocation of equal percentages of fault to DCL and Rusich essentially imposes vicarious liability upon DCL for the actions of Rusich’s employees, and therefore,' constitutes legal error. With respect to DCL’s liability in this case, we have already found that the trial court did not manifestly err in finding that DCL was liable to Plaintiffs under Article 667 because DCL knew or should have known of Rusich’s employee’s negligent activity taking place on its property, and that DCL failed to exercise reasonable care to prevent the resulting damages to Plaintiffs caused by those activities. Therefore; our review shows that the basis for DCL’s liability to Plaintiffs arises under Article 667. The trial court’s allocation of 50% of the fault to DCL-does not change that basis of liability to vicarious liability, nor does it constitute legal error.
Applying the Watson factors set forth above, we find that the trial court’s fault allocation of 50% to DCL and 50% to Rusich is within an acceptable range, and therefore, is not manifestly erroneous. The trial court heard extensive testimony firsthand regarding Rusich’s practice of repairing bumpers through the use of heat, and DCL and Rusich’s exclusive control of the alley. In its findings of fact, the trial court emphasized that Bryon Rusich testified that both he and Gary Rusich maintained managerial responsibilities for DCL *502 and Rusich, and that they were both fully aware of all activities of Rusich employees, including their use of heat to repair bumpers. The Court in Yokurn warned against allowing owner/lessors with knowledge of the potential harmful effects of their lessees’ activities to escape responsibility under Article 667 for damage caused by those activities by establishing a lease on their property. Yokum, supra at 875. After reviewing the evidence, and giving deference to the trial court’s findings, we find that DCL and Lafayette have failed to show that the trial court’s allocation of fault Lsof 50% to DCL and 50% to Rusich was manifestly erroneous or clearly wrong in this case.
Furthermore, we do not find, as DCL and Lafayette contend, that the trial court committed legal error in failing to separately allocate the fault of Bryon Rusich, Gary Rusich, Alexander, or of any other Rusich employee. With respect to Alexander, the trial court’s findings of fact show that it found that Alexander was an employee of Rusich at the time of the fire, and that it considered Alexander’s fault in connection with the fire, based upon his statements made to Lowe concerning heating bumpers in the alley. We note that under La. C.C. art. 2320, employers are answerable for the damage occasioned by their employees, in the exercise of the functions in which they are employed. Because the principles of comparative fault are not compromised when the trier of fact aggregates the fault of different persons into a single fault assessment against their vicariously liable employer, we find no error in the trial court’s assessment of 50% fault against Rusich in this case. See Molina v. City of New Orleans, 01-1411 (La. App. 4 Cir. 10/2/02), 830 So.2d 994, 1000, writ denied, 03-0156 (La.3/28/03), 840 So.2d 573.
Contrary to DCL and Lafayette’s assertions on appeal, we have found nothing in the record indicating that the trial court found Bryon Rusich, Gary Rusich, or any Rusich employee, other than Alexander, had any involvement in causing the fire at issue. Therefore, we find DCL and Lafayette’s argument that the trial court erred in failing to separately allocate any fault to the Rusich brothers or to any other Rusich employees, to be without merit.
Finally, DCL and Lafayette contend that the trial court erred in failing to assess damages against DCL proportionate to its percentage of fault. We agree. Our review shows that the trial court failed to apply DCL’s 50% fault allocation to the damages assessed against DCL in the June 16, 2014 judgment. Instead, the Lfltrial court assessed $2,856,352.60 in damages against DCL, which was the same amount it previously assessed against both DCL and Rusich for the full amount of Plaintiffs’ damages sustained as a result of the fire. Because we have affirmed the trial court’s allocation of 50% of the fault to DCL, we find that the trial court erred in failing to assess damages against DCL proportionate to its percentage of fault for Plaintiffs’ damages. Therefore, the June 16, 2014 judgment must be amended to apply DCL’s fault allocation bf 50% to the total amount of damages awarded to Plaintiffs for all of their damages sustained in the fire: $2,856,352.60. Accordingly, we hereby amend the June 16, 2014 judgment to award damages in favor of Plaintiffs and against DCL in the amount of $1,428,176.30, together with legal interest from the date of judicial demand, plus costs of the trial court proceedings.
EVIDENTIARY RULINGS
On appeal, DCL, Lafayette and Rusich argue that the trial court erred with re *503 spect to three of its evidentiary rulings made at trial.
First, DCL and Rusich contend on appeal that the trial court erred in excluding the September 22, 2006 Kenner Fire Department report (“the fire department report”) from evidence. However, our review shows that prior to trial, DCL and Rusich filed a writ application to this Court seeking review of the trial court’s August 13, 2013 judgment which granted Kenner Plumbing’s motion in limine to exclude the fire department report. This Court denied the writ application, after finding no abuse of the trial court’s discretion in granting Kenner Plumbing’s motion in limine to exclude the fire department report. Kenner Plumbing Supply, Inc., et al. v. Rusich Detailing, Inc., et al, 13-C-743 (La.App. 5 Cir. 10/1/13) (unpublished writ disposition). We believe our prior ruling on DCL|4nand Rusich’s writ application regarding the same evidentiary ruling that they seek to challenge in this appeal, is “law of the case.”
The “law of the case” principle relates to (a) the binding force of trial court rulings during later stages of the trial, (b) the conclusive effects of appellate rulings at the trial on remand, and (c) the rule that an appellate court will ordinarily not reconsider its own rulings of law on a subsequent appeal in the same case. Ficarra v. Mt. Vernon Fire Ins. Co., 527 So.2d 493, 494 (La.App. 5 Cir.1988). It applies to all prior rulings or decisions of an appellate court or the supreme court in the same case, not merely those arising from the full appeal process. In re K.P.W., 03-1371 (La.App. 5 Cir. 5/26/04), 875 So.2d 903, 905. The reasons for the law of the case doctrine are to avoid re-litigation of the same issue; to promote consistency of result in the same litigation; and to promote efficiency and fairness to both parties by affording a single opportunity for the argument and decision of the matter at issue. Id. Nevertheless, the law of the case principle is applied as a discretionary guide, thus argument is barred where there is merely doubt as to the correctness of the former ruling, but not in cases of palpable error or manifest injustice. Ficarra, supra.
In this case, neither our review nor DCL and Rusich’s brief, reveals any indication that this Court’s prior determination of the trial court’s decision to grant Kenner Plumbing’s motion in limine to exclude the fire department report, resulted in palpable error or manifest injustice. Accordingly, we consider our prior ruling on the trial court’s grant of Kenner Plumbing’s motion in limine as the “law of the case,” and decline to reconsider this issue in this appeal.
Next, DCL and Lafayette contend that the trial court abused its discretion in denying DCL’s motion in limine to exclude any testimony of Plaintiffs’ expert CPA, Burt Verdigets, that related to sales information of Johnstone Supply. In |4i support of their motion, DCL and Lafayette argued that Johnstone Supply was not a comparable business to Kenner Plumbing, and thus, any use of Johnstone Supply’s sales figures in calculating Kenner Plumbing’s lost profits was irrelevant and unfairly prejudicial. In denying DCL and Lafayette’s motion in limine at trial, the trial court stated that it would be able to “look at both sides and make a determination as to how much weight that particular information is going to be given.”
The trial court is given vast discretion in its evidentiary rulings, and its decision to admit or exclude evidence will not be reversed on appeal in the absence of an abuse of discretion. McKinnis v. Reine, 10-753 (La.App. 5 Cir. 4/26/11), 65 So.3d 688, 691. We find no abuse of the trial *504 court’s vast discretion in ruling on this evidentiary matter. Therefore, we find that Verdigets’ testimony based upon the sales information from Johnstone Supply was properly before the court at trial.
Finally, DCL and Rusich contend that the trial court erred in refusing to allow J.C. Townley to testify at trial as an expert in construction components, zoning, planning and construction, and the practical application of building, fire, and safety codes.
In order to be admissible, expert testimony must not only be relevant but also reliable. Ladart v. Harahan Living Ctr., Inc., 18-928 (La.App. 5 Cir. 5/14/14), 142 So.3d 103, 109. The trial court is required to exercise a gate-keeping function to insure an expert’s testimony is reliable. Id. The trial court has broad discretion in determining who should or should not be permitted to testify as an expert, and a trial court’s decision regarding the 'qualification of an expert will not be overturned absent an abuse of that discretion. Id. This discretion is even greater in a bench trial. Holzenthal v. Sewerage & Water Bd., 06-0796 (La.App. 4 Cir. 1/10/07), 950 So.2d 55, 74. The trial court may properly exclude the testimony of any witnéss as |42an expert where that person is unable to demonstrate sufficient training or experience in the field for which he has sought to qualify as an expert. Ladart, supra at 110.
On appeal, DCL and Rusich concede that Townley had no expertise in the field of cause and origin of fire, and they contend that they were not offering Townley as an expert in that field. However, when asked by the trial judge what • Townley would be testifying to, DCL and Rusich statéd that Townley would testify as to “what, if anything, Kenner Plumbing Supply, Inc. did or failed to do as it relates to the practical application of building codes and fire codes and safety codes, and that may have caused the fire that caused the Kenner Plumbing building to be a worse situation than it normally would have been.” The trial court then refused to qualify Townley to testify as an expert. Based upon our review, we find no abuse of the trial court’s vast discretion in excluding Townley from testifying as an expert in this case.
CONCLUSION
For the foregoing reasons, we hereby amend the June 16, 2014 judgment to award damages in favor of Kenner Plumbing, MCC, and Future Property, and against DCL, in the amount of $1,428,176:30, together with legal interest from the date of judicial demand, plus costs of the trial court proceedings. In all other respects, we affirm ■ the April 30, 2014 judgment, as amended by the June 16, 2014 judgment. Each party shall bear their own costs of these appeals.

AMENDED IN PART: AFFIRMED AS AMENDED

. Lawrence Rusich also has an ownership interest in DCL, but not with respect to Ru-sich.

. The wife of Jody Grass also has an ownership interest in Future Property.

. In its appeal, MCC adopts the brief and arguments set forth in Kenner Plumbing’s appeal,

. The Court in Yokum did not determine the issue of whether the defendant-lessor in that case was liable under Article 667 for the.damages alleged by the plaintiffs, as that issue was not before the Court. Yokum, supra at 876.

. See Merlin v. Fuselier Constr., Inc., 00-1862 (La.App. 5 Cir. 5/30/01), 789 So.2d 710, 717; Ancoin v. S. Quality Homes, LLC, 06-979 (La. App. 3 Cir. 2/28/07), 953 So.2d 856, 861; Touro Infirmary v. Sizeler Architects, 04-0634 (La.App. 4 Cir. 3/23/05), 900 So.2d 200, 205.

. Even assuming the trial court had committed legal error with respect to its allocation of fault, which we do not find in this case, this Court's de novo review on appeal would be limited to the issue of allocation of'fault because'Louisiana courts have held that where “the légal error does not affect all of the jury's findings, the appellate court should confine its de novo review to only those findings that have been interdicted by the error” Banks v. Children's Hosp., 13-1481 (La.App. 4 Cir. *501 12/17/14), 156 So.3d 1263, 1272 (citing Picou v. Ferrara, 483 So.2d 915, 918 (La.1986)).